USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 7/30/2014

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
ANN T. SHAFER,                                    :
                                                  :
                          Plaintiff,              :
                                                  :
              - against -                         :          **OPINION AND ORDER**
                                                  :
THE AMERICAN UNIVERSITY IN CAIRO,                 :          12-CV-9439(VEC)
LISA ANDERSON, and BRUCE FERGUSON,                :
                                                  :
                          Defendants.             :
-------------------------------------------------------------X

VALERIE CAPRONI, United States District Judge:

Dr. Ann T. Shafer brings this lawsuit, *pro se*, against her former employer, the American University in Cairo, as well as the University's President, Lisa Anderson, and her former Dean, Bruce Ferguson (collectively "Defendants"). Shafer alleges that she was subjected to a hostile work environment, demoted,[1] and discriminated against relative to tenure[2] as a result of her identity as a white American Muslim woman.[3] The Defendants, asserting non-discriminatory motivations for all adverse employment actions, moved for summary judgment. The Defendants' motion for summary judgment on these claims is GRANTED. Shafer also alleges

---

[1]     Shafer characterizes the University's action removing her from the Art Program Director position as a demotion. *See, e.g.*, Tr. 149. The record makes clear, however, that the Director position was for a term of years and her term was ending at the end of the school year. While the Plaintiff refers to it as a demotion, this opinion will generally refer to it as a premature end to her directorship. From the perspective of relevant employment law, either could be an adverse employment action.

[2]     It is not entirely clear exactly what the Plaintiff asserts is the adverse action. There are three linked possibilities: her contract was not renewed; she was not given tenure; and the University did not establish for her a unique tenure process to her liking. As will be discussed below, AUC has a six year tenure track. Thus, Shafer's second three-year contract specified that it was not subject to renewal unless she successfully obtained tenure prior to its conclusion. Shafer did not apply for and therefore did not obtain tenure. Her excuse for not applying was that she was unsatisfied with the tenure process and the University would not agree to the process that she had proposed. Thus, the three tenure-related actions are intertwined.

[3]     Dr. Shafer apparently wishes to distinguish herself from both Egyptian Muslims and Arab-American Muslim women. *See Census Considers How to Measure a More Diverse America*, N.Y. TIMES, July 1, 2014, at A12 ("Arab-Americans are broadly classified as white in the [U.S.] census.").

that, as a result of her complaining about being discriminated against, including by filing a complaint with the University's Senate Grievance Committee and the Equal Employment Opportunity Commission ("EEOC"), she was retaliated against by being excluded from faculty committees.  The Defendants' motion for summary judgment on Plaintiff's claim of retaliation is DENIED.

## BACKGROUND[4]

### I.    The Beginning: 2005-2010

In 2005, the American University in Cairo ("AUC") hired Dr. Ann Shafer as a tenure track Assistant Professor in the Department of Performing and Visual Arts ("PVA"), within the School of Humanities and Social Sciences ("HUSS").  Tr. 26, 28, 36,[5] Def. Local R. 56.1 Statement ("56.1 Statement") ¶ 14.  Shafer signed a three-year contract.  In addition to being an Assistant Professor, she was also Art Program Director.  Tr. 27, 31-32, 56.1 Statement ¶¶ 14-15.[6] Shafer reported to the PVA Department Chair, Stancil Campbell, who, in turn, reported to the HUSS Dean (at that time, Ann Lesch).  Shafer appears to have had a successful start at AUC; her first three-year contract was renewed to extend through the 2010-11 academic year, and she received several grants, including a pre-tenure award of a semester off (spring semester 2008), with pay, to allow her to develop her publication portfolio prior to applying for tenure.  Anderson

---

[4]       Shafer has not complied with Local Civil Rule 56.1.  Because the plaintiff is *pro se*, the Court has combed the record to marshal the facts in support of her position rather than accepting as true all of the facts in the Defendants' submission, which the Court would otherwise do under Rule 56.1(c).  *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001).  All facts have been viewed in the light most favorable to the plaintiff as the non-moving party.

[5]       Citations to "Tr." are references to Shafer's deposition.  References to the Anderson Declaration refer to the first such declaration except where specifically noted.

[6]       There are four programs within PVA: Art, Theatre, Film, and Music.  Each program is led by a separate director.

Decl. Ex. B, Ex. C.  Her second contract specified that at its termination, Shafer could not remain

at AUC if she had not secured tenure.  Anderson Decl. Ex. B.

As Art Program Director, Shafer's responsibilities included overseeing part-time faculty,

advising art students, assessing and developing the curriculum, managing the budget, recruiting

students, overseeing AUC's art galleries, and other administrative tasks.  Tr. 31-32.  To

compensate for these administrative responsibilities, she had a lighter than normal teaching load.

Tr. 33.

Not long after she started at AUC, in 2006, Shafer converted to Islam.  Tr. 93.  She

decided to perform the *hajj* pilgrimage during the 2009-10 academic year.  Tr. 52.  Shafer did not

believe that she could balance the *hajj* with her workload at AUC and recognized that, even after

having a semester off to work on her publications portfolio, she still needed to do additional

work to be a strong tenure candidate.  Tr. 51-52.  As a result, she asked then-Provost Lisa

Anderson for permission to take the 2009-10 academic year as unpaid leave.  Tr. 50-52.  Shafer

did not consult with the Chair of her department or the Dean of her school prior to speaking with

the Provost.  Tr. 50-51.  Eventually, she did speak with them about her plans (although not her

motivation for seeking the leave).  Anderson Decl. Ex. D.  Both were supportive of the leave,

and both noted in official AUC documents that a leave of absence would help Shafer to secure

tenure.  *Id.*  Moreover, AUC agreed to "stop the clock" on her contract term and on the deadline

to obtain tenure for the year she was away on unpaid leave.  Tr. 55, Anderson Decl. Ex. D.

Shafer spent part of the 2009-10 academic year in Saudi Arabia, where she fulfilled her

religious duties and worked as a visiting professor at a Saudi Arabian university, and spent the

balance of the year at Harvard, where she did research to help with her publications.  Tr. 53-54,

Anderson Decl. Ex. D.

## II.      The Fall 2010 Semester

While Shafer was on leave, AUC hired a new Dean for HUSS, Dr. Bruce Ferguson. Ferguson Aff. ¶ 4.  Dean Ferguson began in September 2010.  That school year, fall semester began during Ramadan.  Anderson Decl. ¶¶ 16-17.

Although she had been away from campus and her program for a year and her school had a new Dean (who happened to be a professor in her program), Dr. Shafer chose to miss the beginning of the semester and only return to Cairo and campus after Eid al-Fitr, the holiday that ends Ramadan.  That schedule resulted in her missing one of her scheduled classes and not being present on campus to deal with any issues that arose.  Tr. 72-73.  Shafer did not clear her late return with anyone at AUC, including with the new Dean, but, instead, on the first day of classes simply informed the PVA Chair of her plans.  Tr. 73.[7]

Dean Ferguson was unhappy with the unilateral decision of Shafer and another faculty member not to be on campus at the beginning of the school year.  Ferguson sent an email to Campbell and then-Provost Anderson complaining about their "poor judgment."  Ferguson Aff. Ex. A.  Ferguson found their behavior to be "unsatisfactory" and wanted it noted in Shafer's personal file.  *Id.*  Ferguson was aware that Shafer's delayed return to campus was based on the timing of Ramadan but noted that many AUC faculty members were Muslim and were able to practice their religion and still satisfy their faculty responsibilities.[8]  *Id.*

---

[7]      The PVA By-Laws require whenever a faculty member is going to miss a class, he or she must notify the Chair in advance.  Ferguson Aff. Ex. B at 9.  Shafer had made arrangements for another teacher to cover the class she missed by virtue of not returning to Cairo before the beginning of classes.

[8]      Shafer asserted that she did not return to campus for the beginning of classes because she did not want to break the Ramadan feast, which long-distance travel typically requires, and she wanted to celebrate the Eid al-Fitr holiday with her family.  Shafer Opp. at 2.  She advanced no explanation why, knowing classes were scheduled to begin during Ramadan, she believed it would be acceptable to celebrate with her family rather than to arrange her travel schedule so that she could be on campus at the beginning of the school year.

After Shafer returned to campus, she met Dean Ferguson.  Although they shared an arts background, Tr. 89, their initial encounter did not go well from her perspective.  At the end of a meeting with Campbell (Chair of the PVA Department) and Shafer that was otherwise pleasant, Ferguson indicated that he had been getting to know Cairo and that he had amused himself by "taking a lot [of] photographs of 'veiled cars.'"  Tr. 100.  Ferguson explained during discovery that he was referencing the Egyptian practice of covering parked cars in cloth to protect them from dust.  Ferguson Aff. ¶ 70.  Shafer testified that when Dean Ferguson referred to the cars as "veiled" she was offended because she believed he was making a derogatory slur against Muslim women, like her, who wear a *hijab*.[9]  Tr. 100; *but see* Ferguson Aff. ¶ 71 (conceding that he may have used the term "veiled," but asserting that it was not a reference to Muslim women).  While Shafer did not interpret this remark as an attempt to intimidate or harass her, she believed that it revealed Ferguson's bias against Muslim women because, in her view, he compared them to cars.  Tr. 366-68.  Although she points to that comment as one of the more significant pieces of evidence demonstrating, from her perspective, discriminatory intent on the part of Ferguson, she did not protest his statement at the time.  Moreover, Shafer admitted that she never heard him make another comment that she viewed to be a slur against Muslims generally or Muslim women particularly.  Dkt. 60 at 19.

At some point during fall semester 2010, Ferguson invited Shafer to a dinner party with guests from the local arts community.  Ferguson specifically suggested that Shafer sit next to William Wells, the director of a prominent gallery in Cairo.  The Dean believed that AUC and Wells' gallery could benefit from a collaborative relationship.  Ferguson Aff. ¶ 11, Tr. 107.  According to Shafer, with Ferguson sitting nearby and in front of other faculty members, Wells

---

[9]        Shafer returned to campus in fall 2010 wearing a *hijab* for the first time.  She asserts that she was the first "white" woman to wear a *hijab* at AUC.  Tr. 88-89.

"humiliated" her by speaking to her in a condescending manner, criticizing her leadership and referring to AUC's art program as a "disaster."  Tr. 107-08, 114.  Shafer believed that Wells' criticisms were tied to Shafer's religious conservatism.  Tr. 116-17, 119-20; Dkt. 60 at 21-24.  Although Ferguson was sitting nearby, he did not intervene on Shafer's behalf.  Tr. 107; *but see* Ferguson Aff. ¶ 13 (asserting that Ferguson was unaware of the substance of the conversation).  Shafer asserted that she thought that Ferguson had "orchestrated" the "hostile" dinner deliberately to single her out, Tr. 369, but acknowledged that she had no evidence that Ferguson was aware that Wells was hostile to Muslims (assuming, despite Shafer's acknowledged lack of evidence, that Wells is, in fact, hostile to Muslims, *see* Dkt. 60 at 24).  Shafer later told Ferguson that Wells' vision of the AUC art program could not be implemented because it would conflict with the religious values of students at AUC, both Christian and Muslim.  Shafer never told Ferguson that she believed Wells disliked her because she was Muslim.  Tr. 117.  Shafer was upset, however, that Ferguson seemed indifferent when she pointed out that Wells' values were in tension with the religious values of the AUC students.  Tr. 117-18.

During the same meeting in which they discussed Wells, Shafer sought advice from Ferguson about how to prepare her tenure application.  Tr. 121, Ferguson Aff. ¶ 15.  Instead of giving Shafer concrete advice, Ferguson inquired about her level of commitment to academia and discussed the repercussions on a professor's career when a tenure application is rejected.  Tr. 122.  Shafer understood this conversation, in light of the dinner party event and the "veiled cars" comment, to mean that Ferguson would not support her tenure application, at least in part because of her religion.  Tr. 125-27.

In late November or early December 2010, Ferguson decided that there should be an election to replace Shafer as Art Program Director.  Ferguson Aff. Ex. C.  According to the PVA

bylaws, the Art Program Director and the Director of Theatre are supposed to change at the same time as the PVA Chair.  The PVA Chair's term was set to end at the conclusion of the 2010-11 academic year (under the bylaws, the Directors of the other two sub-departments, film and music, were both *de facto* appointments made only to full-time faculty members in each sub-department).  Ferguson Aff. Ex. B at 6-8; Tr. 382.  The bylaws provided that HUSS would hold elections for the Chair position in December prior to the expiration of the incumbent's term in May.  Ferguson Aff. Ex. B at 2.  The bylaws held no similar timeline for the program director positions; these could be "designated on the basis of [professors'] AUC contract, [could] be elected by the faculty of a program, or in some cases may be appointed by the Chair."  *Id.* at 5.[10] Although the timing of the term was supposed to coincide with the timing of the Chair's term, there was no requirement that the election happen six months prior to the expiration of an incumbent's term.  *Id.* at 6, Tr. 384.  Shafer testified that it was "general practice" to hold the program directors election "in the spring prior to the change of office."  Tr. 384.

Shafer did not want to stop being Art Program Director prematurely as she saw the position as an asset to her anticipated tenure application.  Rather than discussing the matter with Dean Ferguson, she just did not convene the election as he had directed.  Tr. 387.  Ferguson pressed the issue in an email to Shafer on December 6.  Ferguson Aff. Ex. C.  Shafer spoke to the other program directors and – based in part on the fact that the candidates for her position were on one-year contracts while the search for a new full-time art faculty member continued – the Directors all agreed to hold off on holding elections until the spring, as was customary.  *Id.*[11]

---

[10]     The bylaws also provided that the Art Program Director "shall be elected by the art faculty," Ferguson Aff. Ex. B at 6, although that is not how Shafer first assumed the position, Anderson Decl. ¶ 10.

[11]     The record is unclear whether the other program directors were aware that the Dean had specifically directed that the Art Program Director election proceed.

When Shafer told Ferguson that the directors had decided to postpone the elections, the Dean

was not pleased to learn of this direct contravention of his unambiguous instruction to hold the

election immediately and again directed her to convene the election.  *Id.*  He also complained to

Shafer and Campbell, describing the postponed election as "completely unacceptable" and

"reason enough to have a change in leadership."  *Id.*  Ferguson couched his decision as

adherence to a "well-know[n] and well-worn university process," made out of "logic and an

attempt to systematize behavior along a professional path."  *Id.*[12]

    When Shafer did not convene an election, on December 22, Ferguson emailed the PVA

faculty to announce elections for the PVA Chair and the Art Program Director.  Ferguson Aff.

Ex. D.  This email noted that Shafer "would be stepping down from this position as is the regular

procedure for unit directors after this number of years."  *Id.*  Ferguson provided a neutral reason

for the timing of the election – "a new director would have at least this spring session to be

mentored by [Shafer] and me in anticipation of taking over the position in the summer."  *Id.*  He

also included some language that Shafer perceived as a slight, including a comment that she

"was unfortunately away for 1.5 [years][13] during her leadership" and stating that "the unit needs

and wants stability and this is the opportunity to do so."  *Id.*  The Dean attended the meeting at

which the PVA faculty elected a new Chair; because politicking by the candidates for the Chair

position ran long, the meeting – and semester – ended before the art program faculty could elect

a new Director.  Tr. 387-88.

---

[12]    Nothing in the bylaws or "well-worn university processes" would have prohibited Shafer from seeking reappointment.  Shafer had, however, told Ferguson that she would not seek to renew her positon as Director. Ferguson Aff. ¶ 35.

[13]    This includes Shafer's unpaid leave for the 2009-10 academic year and her paid leave for spring semester of 2008.  Tr. 391-92.

During the 2010 fall semester, Shafer applied for and obtained a grant to attend an

academic conference to present her work.  Tr. 133.  The conference was scheduled for February

2011 in New York.  Tr. 137.  Dean Ferguson's office approved the grant.  Tr. 141-44, Ferguson

Aff. ¶ 44.

## III.    The Winter Session and Spring Semester 2011

Classes for spring semester were scheduled to begin on February 13, 2011.  Although

several part-time faculty members in her program began that semester, Shafer was not in Cairo to

welcome them or to help them acclimate to AUC, at least in part because she was in New York

to attend a conference.  Tr. 142, 144-45.  Shafer communicated with one faculty member whom

she had hired; however, she did not reach out to at least one new teacher whom she did not know

to be starting at the beginning of the semester.  Tr. 145-47.[14]

Dean Ferguson was annoyed by Shafer's absence at the beginning of the semester,

apparently believing that it had not been approved by his office.[15]  He raised the issue with the

new Provost, Medhat Haroun, who agreed that he could remove Shafer as Art Program Director.

Ferguson Aff. ¶ 48.  The Dean sent Shafer an email on February 9, 2014, describing her absence

and failure to communicate with him as "an indefensible breach of responsibility" and

announcing her removal as Art Program Director:

> For this reason and others including the fact that you were weeks late for classes
> this fall and [were] unable or unwilling to guide new faculty at that time; a condition

---

[14]    Although the parties do not address the issue, it is noted that classes did not resume on a standard academic
calendar during the spring of 2011 due to protests in Cairo frequently referred to as the Arab Spring.  Ursula
Lindsey, *Am. U. in Cairo Reopens, Causing Tension for Some Faculty Members*, CHRON. OF HIGHER EDUC. (Feb.
15, 2011).  The record suggests that Shafer was not on campus during what AUC terms its "winter session," a
standalone semester in January.  *See Academic Calendar*, AM. UNIV. IN CAIRO,
http://www.aucegypt.edu/academics/Pages/AcademicCalendar.aspx (accessed July 28, 2014); Ferguson Aff. Ex. E.

[15]    As noted above, Ferguson had approved the use of University funds to pay for Shafer's trip.  While he,
therefore, clearly was on notice that she would be attending the conference, it is entirely understandable that in the
hubbub of Cairo of that time, when numerous faculty members were absent and the administration was not sure who
would return, he may have forgotten about it.  There is no evidence that Shafer reminded him that she would be
away at that time to attend the conference, and Ferguson avers that she did not.  Ferguson Aff. ¶¶ 44-46.

> which is repeated now in the winter session due to a lack of communication and
> which has left new faculty unattended; and because I think you need to concentrate
> on your tenure application, I am relieving you of the role of director of the visual
> arts unit.  Thank you for your efforts in this role in the past.  I continue to hope that
> you will return and fulfill your faculty obligations.[16]

Ferguson Aff. Ex. E.  Shafer responded by denying that she left new faculty unattended or failed

to communicate with the administration.  Ferguson Aff. Ex. F.  She wrote that Dean Ferguson's

"communication ha[d] been nothing but violent[17] toward [her] since [he] arrived in September"

and asserted that the Dean "attempted to inflict severe emotional trauma because [Shafer stood]

in the way of [Ferguson's] own personal business gain."  *Id.*[18]  Shafer was particularly upset that

the Dean, who was "responsible for [Shafer's] well-being," did "nothing but try to persuade [her]

to leave AUC."  *Id.*

Ferguson responded the same day, copying now-President Anderson, Provost Haroun,

Chair Campbell, and two others.  Ferguson Aff. Ex. F.  He responded:  "I have no idea what your

wild accusations are based on but I do understand that you have slandered me in public before so

perhaps I shouldn't be surprised."  *Id.*  He reminded Shafer of the President's direction that

faculty return by February 13 or risk termination.  *Id.*

Ferguson emailed Campbell, with copies to several others, to inform him that Shafer had

been removed from the Director position.  Ferguson Aff. Ex. G.  Ferguson stated that Shafer had

been removed "for a number of substantive reasons," but did not elaborate.  *Id.*; Ferguson Aff.

---

[16]   Dean Ferguson's email suggests that Shafer had not communicated with AUC for some considerable time.
This issue was not addressed in Shafer's deposition or in Ferguson's affidavit.

[17]   Shafer admitted later that "violent" was the wrong word but asserted that she believed that Ferguson had
been "really aggressive" in trying to oust her from her position.  Tr. 156.

[18]   As the Court understands it, Shafer ties part of Ferguson's perceived hostility to her to her disapproval of
AUC's relationship with the gallery owner Wells, discussed above.  In Shafer's view, Wells and Ferguson had a
business arrangement (Ferguson was on the Board of Directors of Wells' Gallery; Ferguson hired artists whom
Wells represented onto the AUC faculty).  Because Shafer did not approve of Wells, Shafer believes, Ferguson was
hostile to Shafer.  Tr. 155-57, 465-68.

¶¶ 53-55.  Ferguson appointed Deebi to assume Shafer's Director role on an interim basis.

Ferguson Aff. Ex. G.  He also indicated that, should Shafer not return the next day, he would

"assume that she has resigned."  *Id.*  Shafer returned the next day, which was the day after the

conference ended.  Her return coincided with the first day of classes.  Tr. 151.

    In addition to removing her as Program Director, Dean Ferguson replaced Shafer as the

instructor of Art 470, a popular course involving one-on-one tutoring of students that culminated

in a major exhibition of all of the student works.  Tr. 436-37.  According to Shafer, the Dean did

not inform her that she was being replaced as the professor of that course; instead, she showed up

to teach the class as usual and the new instructor was forced to inform her, in front of the class,

that she had been replaced.[19]  Tr. 436.  Ferguson also suspended a search committee for a new

full-time art faculty member.  Shafer believes he did so because she was chairing the committee;

the Dean asserted that the budget would not permit hiring a new full time professor and therefore

there was no reason to continue the search.  Tr. 449, 454-55.  At or around the same time that

Ferguson cancelled the search Shafer was chairing, he appointed two full-time faculty members.

Tr. 454-57.

    With these grievances in tow, Shafer met with Provost Haroun to complain about what

she viewed as mistreatment by her Dean.  Tr. 478-79.  Shafer requested mediation, and the

Provost agreed to help them sort through their issues together.  Tr. 482-83.  The record does not

reflect whether the Provost met with Ferguson, but, on February 26, the Provost emailed

Ferguson, Campbell, Shafer, and one unidentified individual.  Ferguson Aff. Ex. H.  He

described the status of the art program as "awkward."  *Id.*  He reinstated Shafer as the instructor

---

[19]     Shafer described this event more benignly in her complaint to the Senate Grievance Committee.  Anderson
Decl. Ex. E at 13.  For the purposes of this summary judgment motion, because all facts must be construed in favor
of the non-moving party, the Court will assume that Shafer's sworn deposition testimony, which presents the version
most favorable to Shafer, is accurate.

for Art 470,[20] unfroze the search committee of which Shafer was the Chair, appointed Dean

Ferguson to oversee the Art Program until "such time when the normal change of the leadership

of PVA and its units takes place," required changes in the art curriculum to be made in

consultation with other AUC programs, and specifically noted that it was "in the best interest of

Dr. Ann Shafer to focus her efforts at this point on the preparation of her upcoming tenure case."

*Id.*

That email, although reversing several of the Dean's decisions that Shafer objected to,

apparently did not calm the situation.  Four days later, Ferguson emailed Shafer, indicating:

> I hear many rumors about the art unit.  Because they are rumors I have no way to
> substantiate them although most of them sound absurd and involve behavior that
> doesn't sound reasonable or professional.  However, as you know, my door is
> always open to discuss anything with you and I look forward to seeing you soon.

Ferguson Aff. Ex. I.

Shafer interpreted this email to be intimidating and threatening.  Tr. 424, 428.  Rather

than responding or accepting the Dean's offer to meet, she spoke instead to others in the

department, including PVA Chair Campbell.  According to Shafer, these people then asked the

Dean to explain the basis for Shafer's removal from the Director position at a faculty meeting,

Tr. 228.  Dean Ferguson brought the Provost to the meeting, but when the subject of Shafer's

removal came up, Ferguson avoided the topic out of an effort not "to embarrass her in front of

her colleagues."  Ferguson Aff. ¶ 59; Tr. 228.  At this meeting, the Provost laid out a long-term

plan for the department that would require fewer part-time faculty positions.  Tr. 277.  Shafer,

recognizing that this would mean that some of her friends would lose their jobs but apparently

---

[20]     According to her Senate Grievance, she did not return to teaching this class "because the underlying issue was not resolved."  Anderson Ex. E at 11.

not recognizing the impropriety of sharing the information without the approval of the Dean or the Provost, emailed her friends informing  them of the Provost's plans.  *Id.*

Later in March, Shafer requested security to accompany her and her students on a weekly community service activity that would be off-campus on Fridays.  Ferguson Aff. ¶¶ 60-63 and Ex. J.  Dean Ferguson, focusing on budget concerns, questioned (through another administrator) the need for security and the propriety of conducting school activities on a Friday.[21]  *Id.*  Shafer addressed the Dean's concerns to his intermediary, assuring her that all of the students had agreed to conduct the community service on Fridays and pointing out that the University required all community-based activities to include security when off-campus.  Perhaps in a fit of pique over administrative red tape or perhaps just out of the depths of her disdain for Ferguson, Shafer added:  "[i]f the Dean prefers that we not take security with us, then I will let him take responsibility for that decision."  Ferguson Aff. ¶ 62.  Better informed of the basis for the request, Ferguson approved it.  *Id.*

## IV.    The Administrative Complaint and Tenure Discussions

In March 2011, Shafer initiated an administrative complaint with the Senate Grievance Committee, the body responsible for faculty complaints of discrimination.  Although she testified that she complained that Dean Ferguson was discriminating against her based on her identity as a white Muslim woman, Tr. 489-90, the Grievance mentions discrimination only obliquely and not specifically tied to religion or gender.[22]  While the Senate Grievance Committee was considering

---

[21]    Ferguson inaptly described Friday as "a religious holiday respected by AUC and the reason we don't teach on Fridays."  Friday is a holy day of prayer, but not a weekly holiday.  *See O'Lone v. Estate of Shabazz*, 482 U.S. 342, 345 (1987) (citing the Koran, 62:9-10); *see also* Carlo A. Pedrioli, *Constructing the Other: U.S. Muslims, Anti-Sharia Law, and the Constitutional Consequences of Volatile Intercultural Rhetoric*, 22 S. Cal. Interdisc. L.J. 65, 106 (Fall 2012).

[22]    Specifically, Shafer wrote to the Senate Grievance Committee:

her complaint, the Provost informed Shafer that she was nearing the deadline to indicate whether she intended to apply for tenure.  Tr. 234-38.  Shafer replied that she could not apply until she knew the results of the Grievance Committee's investigation.  *Id.*  Shortly thereafter, the Grievance Committee decided in Dean Ferguson's favor on Shafer's complaint.  Tr. 236-37.

      Shafer appealed to President Anderson.  Tr. 497.  Anderson indicated that she was not fully informed about Shafer's complaint about Ferguson and was unwilling to discuss the merits of the Grievance Committee's report.  Tr. 505-08.  The President spoke to Shafer at length about the tenure application process and Shafer's desire for an alternative to the normal process.  Tr. 500-02.  According to Shafer, Anderson indicated that AUC could remove anyone directly involved in Shafer's problems in the Art Department from Shafer's tenure committee.  Tr. 289. Shafer specifically sought to exclude Dean Ferguson and the chair of the department from her tenure committee.  Tr. 292-94.  At Anderson's suggestion, Shafer met with the Provost the next day.  The Provost was less enthusiastic about allowing Shafer to exclude specific individuals from her tenure process.  Tr. 290-91.  Moreover, neither the Provost nor the President were receptive to what Shafer really wanted – an extension of her deadline to apply for tenure.  Tr. 295.

---

      It is my claim that Dean Ferguson has shown aggressive and hostile behavior and has jeopardized my standing in the university, including my application for tenure review.  It is my claim that this behavior is in retaliation for my disagreement with him on several issues, including his interest in partnering with the Townhouse Gallery [Wells' gallery], on which Board of Directors he is allegedly an active member.  In my opinion, the Gallery's exhibitions and programs are often inappropriate for AUC students and our previous collaborations have been failures.  Furthermore, it is my firm belief that the role of academia is to shield its practitioners from market influences, and that departmental alliances should be free from bias and exclusivity.  In February 2011 Dean Ferguson demoted me from my position as Art Program Director in a culmination of hostile behavior that began in October 2010.  The stated reasons for my demotion were unfounded and discriminatory, and the action entailed no prior discussion or departmental participation as mandated by our PVA By-Laws.

Anderson Ex. E at 4.

From May through December 2011, Anderson, Haroun, and Shafer discussed various proposals to accommodate Shafer's fear that Dean Ferguson would unduly influence the process.[23]   In substance, Shafer insisted on a process that would have excluded the Provost, the Dean of her school and other high-ranking AUC officials from the review process, would have given Shafer control over membership of her tenure review committee, and would have permitted her to escape the negative consequences of an adverse tenure decision by allowing her to abort the process if tenure was going to be denied.  Anderson Decl. Ex. M.  Not surprisingly, most of those requests were not acceptable to the University although it did offer to exclude Dean Ferguson from the process.  Anderson Decl. ¶¶ 87-98, Ex. Q.

In September 2011, as those discussions were continuing, the art program faculty convened to determine the membership of faculty committees and the direction for the art program for the following year.  Tr. 459.  At the beginning of the meeting, Dean Ferguson announced that the meeting would be recorded.  According to Shafer, when she objected, Ferguson "started yelling" that the meeting was being recorded on the advice of counsel because Shafer was suing the school.  Tr. 403-04.[24]

Deebi, who had formally assumed Shafer's role as Director, ran the meeting.  Tr. 403, 460.  Although Shafer testified that she volunteered for several committees, Deebi informed her that she would not be appointed to any committee as she should focus on developing her tenure

---

[23]     At some point, the Provost stated that he "used to be on Shafer's side," Tr. 275, before Shafer had cast him as a villain in an email to the art program's part-time faculty, Tr. 277.

[24]     The parties disagree about whether the meeting was ultimately recorded.  *Compare* Ferguson Aff. ¶ 67 *with* Tr. 408.  Neither party appears to have a recording of the meeting; that dispute of fact is not material to Defendants' motion for summary judgment.

portfolio.  Tr. 460.[25]  Although Deebi ultimately agreed to allow Shafer to serve on certain

committees, Tr. 461, according to Shafer, no one invited her to the meetings, Tr. 461-62.

Shafer, having failed to reach agreement on a tenure process that she found acceptable,

took maternity leave in spring of 2012.  Tr. 342.  She never applied for tenure, her contract

expired in August 2012, and she has never returned to the University.  Anderson Decl. ¶¶ 101-

02.  Shafer initiated this action in December 2012.


# DISCUSSION

Although Shafer's Second Amended Complaint is not a model of clarity, the Court

understands it to raise claims of a hostile work environment, employment discrimination based

on religion, and retaliation for protected activity, under Title VII, the New York State Human

Rights Law ("NYSHRL"), and the New York City Human Rights Law ("NYCHRL").

Defendants move for summary judgment on all claims.

## I.      Standard of Review

Summary judgment is appropriate when "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "'Where the

record taken as a whole could not lead a rational trier of fact to find for the nonmoving party,

there is no genuine issue for trial.'"  *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)) (internal

quotation marks omitted).  "The moving party bears the initial burden of informing the court of

---

[25]      According to Shafer, she reacted suspiciously to Deebi's comment about her tenure application, asking "point blank" how he knew about her portfolio or even the fact that she intended to apply, seemingly because she believed that it revealed that he was in cahoots with Ferguson, Tr. 459-61.

the basis for its motion and identifying those portions" of the record "that demonstrate the absence of a genuine dispute regarding any material fact." *Curtis v. Williams*, No. 11-CV-1186(JMF), 2014 WL 2619805, at *3 (S.D.N.Y. June 12, 2014).

"At summary judgment in an employment discrimination case, a court should examine the record as a whole, just as a jury would, to determine whether a jury could reasonably find an invidious discriminatory purpose on the part of an employer." *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 102 (2d Cir. 2001). "A motion for summary judgment may be defeated where 'a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.'" *Id.* (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 540 U.S. 133, 148 (2000)).

When a party moves for summary judgment against a *pro se* litigant, courts afford the non-moving party "special solicitude." *Tracy v. Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010). District courts must inform a *pro se* litigant "of the nature of such a motion and the consequences of failing to respond to it properly," *id.* at 102, and must "read [her] pleadings liberally and interpret them to raise the strongest arguments that they suggest," *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003) (quotation marks and citations omitted). This lower standard for *pro se* plaintiffs "does not relieve plaintiff of [her] duty to meet the requirements necessary to defeat a motion for summary judgment." *Id.* (quotation marks and citations omitted).

**II.     There Is No Evidence That Shafer Was Discriminated Against Because of Her Religion**

    **A.     Shafer has not established religious discrimination in violation of Title VII or the NYSHRL[26]**

Courts analyze Title VII and NYSHRL claims "under the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973)." *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012).  "Under *McDonnell Douglas*, a plaintiff bears the initial burden of proving by a preponderance of the evidence a prima facie case of discrimination; it is then the defendant[s'] burden to proffer a legitimate non-discriminatory reason for [their] actions; the final and ultimate burden is on the plaintiff to establish that the defendant[s'] reason is in fact pretext for unlawful discrimination."  *Abrams v. Dep't of Pub. Safety*, --- F.3d ---, No. 13-111-cv, *slip op.* at 15 (2d Cir. July 14, 2014).  Shafer has not established a *prima facie* case of discrimination, but even if she had, she has not presented evidence to create a question of fact whether Defendants' proffered reasons for the adverse actions taken against her are pretextual.

        **1.     Shafer has not established a *prima facie* case of discrimination**

To establish a *prima facie* case of discrimination under Title VII and the NYSHRL, a plaintiff must adduce evidence to show "(1) that [s]he belonged to a protected class; (2) that [s]he was qualified for the position [s]he sought; (3) that [s]he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent."  *Abrams*, --- F.3d at ---, *slip op.* at 15.  "The plaintiff's burden of proof as to this first step has been characterized as 'minimal' and '*de minimis*.'"  *Zann Kwan v. Adalex Grp. LLC*, 737 F.3d 834, 844 (2d Cir. 2013) (quotation marks and citations

---

[26]     There is a substantial question whether the NYSHRL applies to the actions AUC took vis-à-vis Dr. Shafer. *See* Part V, *infra*.

omitted).  For the purposes of summary judgment, the Court assumes that Shafer, who is a member of a protected class, was qualified both for the Art Program Director position and for tenure.  Shafer alleges that she suffered two adverse employment actions – she was prematurely removed as Art Program Director and she was discriminated against regarding tenure.[27]  The question, therefore, becomes whether Shafer has established that these actions occurred under circumstances from which a jury could reasonably infer that Defendants acted with a discriminatory intent.  *See Sassaman v. Gamache*, 566 F.3d 307, 312 (2d Cir. 2009).

An "inference of discriminatory intent may be established by, *inter alia*, 'the employer's invidious comments about others in the employee's protected group; or the sequence of events leading to the [adverse action].'"  *Id.* (quoting *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001)) (alterations omitted).  Shafer points to four facts that she alleges create such an inference: (1) Ferguson's comment regarding "veiled cars"; (2) being invited to a dinner party and being seated next to William Wells; (3) Ferguson's anger that she was not on campus at the beginning of the 2010-11 school year; and (4) AUC's taking adverse actions against only her.  Dkt. 60 at 12-13.

Ferguson's comment about photographing "veiled cars" offended Shafer.  She admitted, however, that she never heard him say anything else that she viewed to be a slur against Muslims, Muslim women or Muslim women who wear veils.  Dkt. 60 at 19.

At worst, Ferguson's comment was a "stray remark" not illustrative of discriminatory intent.  "[T]he more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination."  *Tomassi v. Insignia*

---

[27]      As noted in *supra* note 2, it is not exactly clear what the Plaintiff is alleging was the adverse action: not granting tenure, not renewing her contract or not agreeing to her proposed tenure process.  Because Plaintiff cannot demonstrate a *prima facie* case as to any of the above, it is not necessary to resolve what her claim is precisely.

*Fin. Grp., Inc.*, 478 F.3d 111, 115 (2d Cir. 2007). Courts typically look to four factors to determine whether a remark is a "stray remark:" "(1) who made the remark . . . ; (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark . . . ; and (4) the context in which the remark was made." *Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 149 (2d Cir. 2010). Ferguson was a decision-maker who ultimately took an adverse action against Shafer, so the first factor cuts in Shafer's favor. The other three, however, weigh heavily in favor of finding that Ferguson's comment was a stray remark. He made the comment off-hand, at the end of a meeting, during casual conversation, Dkt. 60 at 18; the comment came months before any alleged adverse action and was not explicitly offensive. Shafer concedes that she has no evidence that Ferguson intended the remark to be a slur against Muslim women or that Ferguson ever made a similar comment. *Id.* at 19. In the absence of other evidence or similar comments, Ferguson's poor choice of words is a "stray remark" that does not tend to show discriminatory intent.

Second, Shafer complains about being seated next to Wells at a dinner party. For purposes of this summary judgment motion, the Court accepts as true Shafer's assertion that Wells told her at dinner that she was doing a bad job with AUC's art gallery because she was "conservative religiously." Dkt. 60 at 35. Although Wells was not an AUC employee, the Court accepts Shafer's assertion, as it must at this stage, that Ferguson was aware that Wells was anti-religious and "promoted" artists who were anti-religious. *Id.* at 24.[28] Nevertheless, Shafer has no evidence that Wells was biased against Muslims, and no evidence that Ferguson was aware of any bias against Muslims that Wells may have held. *Id.* at 33-34. When Shafer discussed Wells

---

[28] During oral argument, Shafer indicated that in her opinion Wells was offensive to "conservative" religious people of either Christian or Muslim faiths. Dkt. 60 at 38.

with Ferguson, she did not complain that he was bigoted or biased against Muslims; instead, she said she told Dean Ferguson that Wells' philosophy, which entailed his art and his lifestyle, promoted values that Shafer believed were not compatible with the conservative religious values of AUC students, both Muslim and Christian. *Id.* at 37-38. Shafer acknowledged that she had no evidence that Wells ever made an anti-Muslim comment or that he ever said anything that was anti-Muslim. *Id.* Dean Ferguson's failure to take Shafer's advice that the school should keep its distance from Wells may have been, as Shafer clearly believes, a poor decision that led AUC to partner with an artist whose values are not in sync with Shafer and at least some AUC students and their parents, but it simply does not evidence anti-Muslim sentiment.[29]

Third, Shafer argues that a jury could infer Ferguson's discriminatory intent from his ire over her absence at the beginning of the 2010 school year. Her absence was motivated by her desire to spend Ramadan and Eid al-Fitr with her family, Tr. 73, and Ferguson was aware of that fact, Ferguson Aff. Ex. A. This is not a sufficient ground to infer discriminatory animus, however. Shafer has no evidence from which a jury could infer that Ferguson was irritated because she was absent *due to* the religious calendar. Dkt. 60 at 16. While Shafer relies on the fact that Ferguson did not raise his dissatisfaction with her immediately, this fact does not support the inference that Ferguson's anger was motivated by her religion – although it may tend to suggest that Ferguson was passive-aggressive or a poor manager. Moreover, Ferguson *did* express his frustration contemporaneously – he emailed Shafer's Chair and the Provost. Ferguson Aff. Ex. A. Nothing in Ferguson's contemporaneous comments to the Chair and the Provost suggest religious bias; they are completely consistent with a new Dean's frustration that

---

[29]     The interesting side-story to which Shafer has alluded – Ferguson's alleged self-dealing by hiring artists from Wells' gallery, of which Ferguson was on the Board – is wholly irrelevant to Shafer's claim of discrimination, even assuming it is true.

he had two faculty members who unilaterally decided to extend their summer breaks and not to return to campus for the beginning of the school year.  Finally, the timing of Ferguson's decision to raise Shafer's tardiness with her has no logical connection to the notion that the annoyance was religiously motivated.

Finally, Shafer asserts that she was treated differently by virtue of the fact that she was Muslim.  Dkt. 60 at 13.  In support of this assertion, Shafer points to the adverse actions taken against her – to wit, she was prematurely removed as Art Program Director and she was not offered tenure.  Shafer has not, however, identified anyone who was similarly situated and did not suffer a similar fate.  *Cf. Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000) ("the standard . . . requires plaintiff to show that similarly situated employees who went undisciplined engaged in comparable conduct").  Shafer was removed as Director for being singularly unresponsive and absent at critical times; the record contains no evidence of a single infraction or note in the file of any employee, non-Muslim or otherwise, that placed that employee in a comparable position.  Shafer was not granted tenure, but she has pointed to no one who was granted tenure without applying.  In short, the Court is unable to infer invidious discrimination from the fact that Shafer was removed from the Director position for transgressions that could easily have resulted in the removal of any Director and from the fact that she was not granted tenure when she did not apply.

Shafer has adduced no evidence from which a jury could reasonably infer that AUC, Ferguson or Anderson harbored discriminatory animus that motivated any adverse employment actions.  In short, Shafer has failed to establish a *prima facie* case of discrimination.[30]

---

[30]     Shafer fails to establish a *prima facie* case as to her tenure claim because she did not apply for tenure.  *See Aulicino v. N.Y. City Dep't of Homeless Servs.*, 580 F.3d 73, 80 (2d Cir. 2009) ("To establish a *prima facie* case of a discriminatory failure to promote, a Title VII plaintiff must ordinarily demonstrate that . . . she applied and was

### 2. Shafer has not established that Defendants' proffered reasons for their actions were pretextual

Assuming *arguendo* that Shafer had established a *prima facie* case of discrimination, she has not rebutted the Defendants' proffered non-discriminatory reasons for the adverse actions taken against her.  First, the Defendants did not offer Shafer tenure because Shafer did not apply; her contract was not renewed because she did not receive tenure.  *See Petrosino v. Bell Atl.*, 385 F.3d 210, 227 (2d Cir. 2004).  The University did not agree to an alternative tenure process because her demands for total control over the process were unprecedented and antithetical to the tenure process.  Anderson Decl. ¶¶ 92-98, 101.  Shafer offers excuses for why she did not apply for tenure – she thought that the odds were stacked against her, particularly after the Provost indicated that he was no longer "on her side."  Tr. 275.  Shafer has produced no evidence, however, showing that AUC's failure to grant Shafer tenure in the absence of a tenure application, its failure to renew her contract when she did not get tenure, and its unwillingness to agree to an unprecedented tenure process just for her were pretextual.[31]

Second, Shafer's removal from the Art Program Director position was the product of Ferguson's belief that she was performing poorly.[32]  The Court need not determine whether Ferguson's evaluation was correct but instead must determine whether Shafer has presented evidence from which a jury could reasonably find that Ferguson's evaluation of her was the

---

qualified for a job for which the employer was seeking applicants. . . .") (quoting *Petrosino v. Bell Atl.*, 385 F.3d 210, 226 (2d Cir. 2004)).

[31]     When an employer has engaged in systematic discrimination such that any reasonable person would view an application for a particular position to be "a futile gesture," formally applying for the position is not necessary. *See Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 366 (1977).  Shafer has not pled a pattern or practice of discrimination so as to bring this exception into play.  *See Brown v. Coach Stores, Inc.*, 163 F.3d 706, 711-12 (2d Cir. 1998).

[32]     Although Ferguson asserts that Shafer's removal was the result of her term expiring, Ferguson Aff. ¶¶ 35-39, the Court notes that Ferguson took steps to expedite the end of her term and ultimately removed her several months before her term expired.

product of impermissible discrimination. "It is not a court's role to second-guess an employer's personnel decisions, even if foolish, so long as they are nondiscriminatory." *Dorcely v. Wyandanch Union Free Sch. Dist.*, 665 F. Supp. 2d 178, 193 (E.D.N.Y. 2009). Among the factors that Ferguson cited in removing Shafer were her absence from AUC for an extended period, Ferguson Decl. Ex. D, her poor communication, *id.* Ex. E, and absence from campus at the beginning of both semesters of the 2010 school year, *id.* Shafer's response – that she was never warned that her absences would reflect badly on her or might lead to her "demotion" and therefore these reasons are pretextual, Tr. 393, 62 – rings hollow.

A reasonable university professor does not need to be told – particularly in the face of a new Dean – that he or she needs to be on campus at the beginning of the semester or, if for some reason the professor cannot be present, to communicate with the Dean to make sure the professor's absence is not a surprise to him or her. That is particularly so when the professor has an administrative position in the department. As anyone who has ever gone to university knows, events occur at the beginning of terms that frequently need administrative resolution. Similarly, a non-tenured professor who is planning to make a run for tenure should not have to be told that being away from campus and school responsibilities for 18 months could signal a lack of commitment to the university and to its need for continuity in its programs. But even if Shafer's complaint were credited that someone should have told her all of that, the University's failure to do so is, at worst, a questionable employment practice, not evidence of discrimination.

In terms of communication, Shafer adduces no excuse for her failure to communicate with the Dean. Faced with his annoyance that she did not seek permission to arrive late for the 2009-10 school year (or even to provide the Dean with the courtesy of personally notifying him that she would be absent but had arranged for coverage of her class), she repeated the same

discourtesy the following semester.  While it is true that he had approved her to attend the

conference, she has presented no evidence why she did not show him the courtesy of reminding

him that she would be away in February to attend the conference and discussing with him the

steps she had taken, if any, to welcome new faculty to the university and to assure that any

beginning-of-the-term hiccups were handled appropriately.

Because Shafer was on leave from AUC partially for religious purposes, she reasons that

using the *fact* that she was away from campus against her could constitute unlawful

discrimination.  There is no evidence from which a jury could infer, however, that Ferguson

knew that Shafer was performing the *hajj* pilgrimage during part of the 2009-10 year.  Moreover,

Ferguson lumped that year (much of which Shafer spent at Harvard allegedly improving her

tenure portfolio) together with the six months paid leave that AUC had awarded as a prize, which

had nothing to do with her religion.  Ferguson Aff. Ex. D.  The undisputed evidence establishes

that Ferguson was irked by Shafer's absence but does not so much as hint that he knew or cared

*why* she was absent.  As to her failure to report at the beginning of both semesters, the same is

true – Ferguson held Shafer's absence against her, but there is not an iota of evidence that he

cared a whit why she was not where he expected her to be.  *Id.*  Ex. E.  Shafer has adduced

evidence from which a jury conceivably could infer that Ferguson was a demanding Dean, but

she has not adduced any evidence to establish that Ferguson's proffered nondiscriminatory

reasons for removing her from her Director position early were pretext for unlawful

discrimination.

Defendants have proffered nondiscriminatory bases for the decisions not to award Shafer

tenure (and not to renew her contract and not to create a unique and unprecedented tenure

process) and to remove her prematurely as Art Program Director, and Shafer has not shown that

these reasons constituted pretext.  Defendants are therefore entitled to summary judgment on

Shafer's religious discrimination claims under the NYSHRL and Title VII.

> **B.      Shafer has not shown that she was treated worse than similarly-situated non-Muslims**

Although the text of the NYCHRL mirrors the NYSHRL, *compare* N.Y.C. Admin. Code

§ 8-107 *with* N.Y. Exec. Law § 296, in 2005, the New York City Council broadened the

protection of the NYCHRL, *see* Local Civil Rights Restoration Act of 2005, N.Y.C. Local L. No.

85 ("Restoration Act").[33]  Claims under the NYCHRL must therefore be analyzed "separately

and independently from any federal and state law claims" and construed "broadly in favor of

discrimination plaintiffs, to the extent that such a construction is reasonably possible." *Mihalik*

*v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013) (citing the

Restoration Act and *Hernandez v. Kaisman*, 103 A.D.3d 106 (1st Dep't 2012)) (internal

quotation marks and some citations omitted).  Unlike Title VII, the NYCHRL "does not require

'a connection between the discriminatory conduct and a materially adverse employment

action.'" *Garrigan v. Ruby Tuesday, Inc.*, No. 14-cv-155(LGS), 2014 WL 2134613, at *3

(S.D.N.Y. May 22, 2014) (quoting *Mihalik*, 715 F.3d at 114).  The proper inquiry under the

NYCHRL is whether a plaintiff "was treated 'less well' because of her [membership in a

protected class]." *Mihalik*, 715 F.3d at 111 (quoting *Williams v. N.Y. City Hous. Auth.*, 61

A.D.3d 62, 80 (1st Dep't 2009) (alteration omitted)).  Although "a jury is often best suited to

make this determination, . . . summary judgment can still be an appropriate mechanism for

resolving NYCHRL claims." *Id.* at 111.  Defendants are entitled to summary judgment "if the

---

[33]      As with the NYSHRL, there is a substantial question whether the NYCHRL applies to this case. *See* Part V, *infra*.

record establishes as a matter of law that 'discrimination played *no* role' in [their] actions." *Id.* at 110 n.8 (quoting *Williams*, 61 A.D.3d at 78 n.27) (emphasis in original).

Shafer alleges that she was treated less well than her non-Muslim colleagues because she was removed prematurely from her position as Art Program Director. Dkt. 60 at 13. As discussed above, however, Shafer has adduced *no* evidence showing that discrimination played *any* part in this decision. *See, e.g.*, *LeBlanc v. United Parcel Serv.*, No. 11-CV-6983(KPF), 2014 WL 1407706, at *18 (S.D.N.Y. Apr. 11, 2014). Shafer's testimony – the only evidence that she adduces at this stage – could establish a question of fact as to whether Ferguson was a nurturing Dean, but it does not even hint, much less permit a reasonable person to conclude, that any part of Ferguson's discontent with her job performance was based on her faith. *See, e.g.,* Dkt. 60 at 19. The bare assertion that Shafer was prematurely removed as Director while the heads of other PVA sub-units were not is insufficient when there is ample evidence that Ferguson relied on non-discriminatory factors and no evidence that he disliked Muslims. The only reasonable conclusion that a jury could draw is that Ferguson removed Shafer prematurely for non-discriminatory reasons. Even under the permissive standard of the NYCHRL, therefore, Shafer has not adduced any evidence that religion played any role in her termination.

### III.    Shafer Has Not Established a *Prima Facie* Case of a Hostile Work Environment

"A hostile work environment claim requires a showing [1] that the harassment was 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' and [2] that a specific basis exists for imputing the objectionable conduct to the employer." *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002) (quoting *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997)). The test for a hostile work environment "has objective and subjective elements: the misconduct shown must be 'severe or pervasive

enough to create an objectively hostile or abusive work environment,' and the victim must also subjectively perceive that environment to be abusive." *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).  "Title VII 'does not set forth a general civility code for the American workplace.'" *Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 176 (2d Cir. 2012) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)) (quotation marks and citation omitted).

Ferguson's response to Shafer's request for security for her community service class, his push to expedite the conclusion of her directorship, and the tone in his emails could come across as "hostile" in a lay sense, but those facts, even combined with Ferguson's "veiled cars" comment and the unpleasant dinner party conversation with Wells, fall well short of a *prima facie* case of a hostile work environment.  *See, e.g.*, *Perez v. Commc'ns Workers of Am. Local 1109*, No. 03-CV-3740(DGT), 2005 WL 2149204 (E.D.N.Y. Sept. 6, 2005), *aff'd,* 210 F. App'x 27 (2d Cir. 2006).  Shafer acknowledged that she has no evidence of "objectively offensive conduct by either Ferguson or Anderson or anyone on the staff or faculty of AUC" rising to the level of race cases where racial epithets are used in the work place.  Dkt. 60 at 40; *cf. Brutus v. Silverseal Corp.*, No. 06-CV-15298(LAP), 2009 WL 4277077, at *5-6 (S.D.N.Y. Nov. 24, 2009) (collecting cases).  Finally, as discussed above, Shafer has adduced no evidence showing that any hostility to which she was subjected was "because of her membership in a protected class." *Brennan v. Metro. Opera Ass'n*, 192 F.3d 310, 318 (2d Cir. 1999).

The NYCHRL permits hostile work environment claims based on a lower showing than Title VII and the NYSHRL require.  *Russo v. N.Y. Presbyterian Hosp.*, 972 F. Supp. 2d 429, 454 (E.D.N.Y. 2013).  "Nonetheless, even under the NYCHRL, petty, slight, or trivial inconveniences are not actionable." *Bermudez v. City of N.Y.*, 783 F. Supp. 2d 560, 579 (S.D.N.Y. 2011) (quotation marks, alteration, and citations omitted); *see also Kim v. Goldberg,*

*Weprin, Finkel, Goldstein, LLP*, 987 N.Y.S.2d 338, 344 (1st Dep't 2014).  Shafer has no

evidence of discrimination above this threshold.

## IV.   There Is a Genuine Dispute of Material Fact as to Whether Shafer Has Established a Claim for Retaliation

Although Shafer has not created a genuine question of fact whether she was

discriminated against, she has created a genuine question of fact whether she was retaliated

against for her complaint of discrimination.  Courts evaluate retaliation claims under Title VII

and the NYSHRL "under a three-step burden-shifting analysis."  *Hicks v. Baines*, 593 F.3d 159,

164 (2d Cir. 2010).  First, the plaintiff must make out a *prima facie* case of retaliation.  *Id.*  If she

succeeds, the defendants "must then 'articulate a legitimate, non-retaliatory reason'" for the

materially adverse action.  *Id.* (quoting *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173

(2d Cir. 2005)).  Finally, the plaintiff must prove "that 'a retaliatory motive played a part'" in the

adverse action.  *Id.* (quoting *Sumner v. U.S. Postal. Serv.*, 899 F.2d 203, 209 (2d Cir. 1990)).

To make out a *prima facie* case, a plaintiff "must demonstrate that '(1) she engaged in

protected activity; (2) the employer was aware of that activity; (3) the employee suffered a

materially adverse action; and (4) there was a causal connection between the protected activity

and that adverse action.'"  *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716

F.3d 10, 14 (2d Cir. 2013) (*per curiam*) (quoting *Lore v. City of Syracuse*, 670 F.3d 127, 157 (2d

Cir. 2012)).  Shafer's complaints of religious discrimination to AUC's Senate Grievance

Committee and the EEOC constituted protected activity of which AUC was aware.  Dkt. 60 at

47.  Shafer alleges three acts of retaliation.  *Id.* at 8-9.  First, AUC did not grant her tenure.[34]

Second, Ferguson attempted to record an Art Program faculty meeting that she attended in

---

[34]    As discussed *supra*, Shafer cannot establish a *prima facie* retaliation claim for tenure because she never
applied.

September 2011.  Ferguson Aff. ¶¶ 64-67.  Finally, Shafer was not permitted to serve on faculty committees in the Art Program.  Tr. 459.

Defendants allege that Shafer's removal from committees and the recording of the faculty meeting are not adverse employments actions.  Def. Supp. Br. 1-3.  They may well be right – but the standard for retaliation relies on the presence or absence of a "materially adverse action," which is distinct from an "adverse employment action."  *White*, 548 U.S. at 62-63 (citing 42 U.S.C. §§ 2000e-2 and 2000e-3).  The cases that Defendants cite are unavailing as they all pre-date *White* or apply the standard for discrimination, rather than retaliation, claims.  *See Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199, 207 (2d Cir. 2006) ("In *White*, the Supreme Court announced a different standard.").  Courts analyze whether an action is materially adverse "objectively, based on the reactions of a reasonable employee.  But 'context matters, as some actions may take on more or less significance depending on the context.'"  *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 25 (2d Cir. 2012) (quoting *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 568 (2d Cir. 2011)).  The *sine qua non* of material adversity is whether "'it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  *Id.* (quoting *White*, 548 U.S. at 68).

In context, construing the evidence in favor of the non-moving party, a reasonable jury could find that Ferguson's decision (even though apparently based on advice of counsel) to record the PVA faculty meeting constitutes a "materially adverse action" under *White*.  By attempting to record the meeting and doing so expressly because Shafer filed an EEOC complaint, Ferguson sent a clear signal to Shafer and to the other faculty members present that complaints about discrimination will be met with hostility and will turn the complaining faculty member into a pariah who cannot be trusted to faithfully report what happened even in a

pedestrian faculty meeting. That sort of hostile reaction to an EEOC complaint is exactly the sort of reaction that could dissuade an employee in the future from attempting to vindicate his or her rights not to be discriminated against.

Although many professors might celebrate being barred from committee work, in the context of an assistant professor applying for tenure at a school that weighs 33 percent of the tenure decision on service to the school,[35] preventing Shafer from participating in faculty committees could also dissuade others from engaging in protected activity. In cases where a professor's participation in such committees would not "adversely affect her job by altering the conditions or her longterm career prospects," it is possible that exclusion would not constitute a materially adverse action. *Whittington v. Trs. of Purdue Univ.*, No. 2:09-C-9, 2012 WL 685502, at *9 (N.D. Ind. Mar. 2, 2012). But here, Shafer's "service duties to the department and to the university . . . were considered one-third of the tenure portfolio." Tr. 208. Moreover, the committees from which Shafer was excluded included one that was entrusted with "a complete revision of the curriculum." Tr. 459. Preventing a professor from contributing to the shape of her department's curriculum, particularly when participating in such a weighty matter might have contributed to the strength of her tenure application, is sufficiently punitive that it could dissuade a reasonable person in her shoes from engaging in protected activity.

Because a reasonable jury could conclude that those actions were retaliatory,[36] Plaintiff has presented a *prima facie* case of retaliation. Because Defendants did not present any neutral,

---

[35]     The PVA By-Laws provide that service to the university is weighed as 15 percent of the tenure consideration. Ferguson Dec. Ex. B at 12. Whether the actual percentage is 15 percent or 33 percent (as Shafer testified) is not relevant to whether AUC retaliated against Shafer.

[36]     Shafer's assertions regarding the events that followed her EEOC and Senate Grievance Complaint were not factually controverted in AUC's motion papers. Whether a jury will credit Shafer's testimony and whether AUC has evidence that contradicts Shafer's testimony remains to be seen.

nonretaliatory reason for the actions complained of, Defendants' motion for summary judgment on Shafer's retaliation claims under Title VII, the NYSHRL, and the NYCHRL is denied.

## V.      The New York State and New York City Human Rights Laws May Apply to Shafer

Defendants also move for summary judgment on Shafer's claims under the NYSHRL and the NYCHRL, asserting that Shafer, as a non-resident of New York, is not entitled to the protection of either statute.[37]  In light of Shafer's *pro se* status, the Court views her representation to the Court that she had an apartment in Brooklyn throughout the relevant time period that she viewed to be her permanent home, Dkt. 60 at 40-41, to be sufficient, at a minimum, to create a genuine dispute as to her residence.  *See Torrico v. Int'l Bus. Machs. Corp.*, 213 F. Supp. 2d 390, 408-09 (S.D.N.Y. 2002).

Defendants do not move for summary judgment on the grounds that the "State and City Human Rights Laws do not apply to acts of discrimination against New York residents committed outside their respective boundaries by foreign defendants."  *Hardwick v. Auriemma*, 116 A.D.3d 465, 466 (1st Dep't 2014), *leave denied*, 2014 WL 2936031.  In a summary order, the Second Circuit seconded the First Department's views, noting that "no Appellate Division department has held otherwise, and there is no persuasive evidence that the New York Court of Appeals would decide the issue differently."  *Harte v. Woods Hole Oceanographic Inst.*, 495 F. App'x 171, 172 (2d Cir. 2012).  In the absence of a motion on this ground, Shafer would have reasonably understood her burden of production and persuasion to be limited to whether she was a New York resident, not whether there was any impact in New York.  *See* Shafer Opp. at 17.

---

[37]      Both New York statutes apply to conduct against non-residents of New York only when "the alleged discriminatory conduct had an 'impact' within the" City or State of New York.  *Hoffman v. Parade Publ'ns*, 15 N.Y.3d 285, 290 (2010).  Although Defendants have described this question as pertaining to subject matter jurisdiction, Reply at 10, it instead challenges whether Plaintiff has stated a claim.  *See, e.g., Martinez v. Bloomberg LP*, 883 F. Supp. 2d 511, 523 n.6 (S.D.N.Y. 2012) ("'To ask what conduct a statute reaches is to ask what conduct the statute prohibits, which is a merits question.  Subject-matter jurisdiction, by contrast, refers to a tribunal's power to hear a case.'") (quoting *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 254 (2010)) (alterations omitted).

Defendants' motion for summary judgment as to Shafer's causes of action under the NYSHRL and the NYCHRL is therefore denied without prejudice for renewal.


## CONCLUSION

Dr. Shafer has not adduced evidence of religious-based discrimination, and Defendants' motion for summary judgment is therefore GRANTED as to her Title VII, NYSHRL, and NYCHRL discrimination claims.  Similarly, Dr. Shafer has not shown that her work environment was "hostile" or that any of the slights that she experienced were motivated by her religion; Defendants' motion for summary judgment is therefore GRANTED as to her Title VII, NYSHRL, and NYCHRL hostile work environment claims.  Dr. Shafer has, however, demonstrated that there is a genuine dispute of material fact as to her retaliation claim; Defendants' motion is DENIED as to this claim under Title VII with prejudice and under the NYSHRL and NYCHRL without prejudice.  The Clerk of the Court is respectfully directed to terminate Dkt. 46, Dkt. 49, and Dkt. 63.[38]

**SO ORDERED.**

**Dated: July 30, 2014**
       **New York, NY**

**VALERIE CAPRONI**
**United States District Judge**

---

[38]     Shafer's unopposed motion seeking to file additional information in support of her opposition to summary judgment, Dkt. 63, is GRANTED.  The Court has considered the additional information in evaluating Defendants' motion for summary judgment.